**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DORIAN WALLS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| CITY OF CHICAGO, Former CHICAGO | ) | |
| POLICE SERGEANT RONALD WATTS, | ) | |
| OFFICER GEROME SUMMERS JR., | ) | |
| OFFICER CALVIN RIDGELL JR., | ) | |
| PHILIP J. CLINE, | ) | |
| and other as-yet-unidentified officers of the | ) | |
| the Chicago Police Department, | ) | |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

## <u>COMPLAINT</u>

Plaintiff Dorian Walls, by his attorneys, Loevy & Loevy, hereby complains against

Defendants, City of Chicago, former Chicago Police Sergeant Ronald Watts, Officer Gerome

Summers Jr., Officer Calvin Ridgell Jr., Philip J. Cline, and other as-yet-unidentified officers of

the Chicago Police Department, and states as follows:

1. Since January 2016, the Circuit Court of Cook County, Illinois has overturned

more than 200 wrongful convictions based on the staggering corruption of Sergeant Ronald

Watts and his corrupt team of Chicago police officers.

2. Dorian Walls was convicted of a crime he did not commit, and his is one of the

most recent of the Watts team's wrongful convictions to be overturned.

3. The crime for which Mr. Walls was framed never happened; it was completely

fabricated by corrupt Chicago police officers.

4. Mr. Walls was arrested on July 4, 2004.

5.     Mr. Walls's arrest occurred at the Ida B. Wells housing complex, a location that was heavily policed by corrupt Chicago police officers.

6.     The corrupt officers sought bribes, planted drugs, and falsely accused many people, including Mr. Walls, of possessing drugs.

7.     The type of encounter these police officers had with Mr. Walls was unfortunately quite common, and the consequences were dire: false arrests, criminal proceedings, incarcerations, and a subsequent felony record.

8.     Believing that he faced no chance of winning at trial after his July 4, 2004 arrest, Mr. Walls eventually pled guilty to the false charge.

9.     After Mr. Walls had completed his sentence, Defendant Watts and former Chicago Police Officer Kallatt Mohammed were caught on tape engaging in the exact type of misconduct that Mr. Walls has alleged.

10.     The federal government charged Watts and Mohammed criminally, and the disgraced officers pled guilty and served time in federal prison.

11.     Since then, evidence has come to light showing that Defendant Watts and his crew engaged in a pattern of criminal misconduct against public housing residents and visitors and that Chicago Police Department officials have long known about that pattern.

12.     The scope of this misconduct cannot be overstated.

13.     For example, the Chief Justice of Illinois' Court of Claims has written that "many individuals were wrongfully convicted," explaining that "Watts and his team of police officers ran what can only be described as a criminal enterprise right out of the movie 'Training Day.'"

14.     The Court of Claims Chief Justice explained that "[o]n many occasions when

− 2 −

these residents [of public housing] refused to pay the extortive demands the Watts crew would fabricate drug charges against them."

15. The Illinois Appellate Court, too, has weighed in on the scope of the scandal, repeatedly calling Watts and his team "corrupt police officers" and "criminals" and chastising the City's police disciplinary oversight body for doing "nothing to slow down the criminals" and their rampant misconduct and perjury.

16. On or around November 16, 2017, the Cook County State's Attorney Office ("CCSAO") successfully moved to vacate the convictions of fifteen (15) individuals framed by the Watts outfit.

17. In light of that decision by the CCSAO and recognizing the scope of misconduct that the City had allowed to flourish more than a decade unabated, fifteen (15) members of the Watts crew were placed on desk duty.

18. Since then, previously convicted petitioners and the CCSAO have successfully moved to vacate many more convictions.

19. In recognition of the scope of their misconduct, the CSSAO will no longer call many of Watts's team – including at least some Defendants in this case – as witnesses "due to concerns about [their] credibility and alleged involvement in the misconduct of Sergeant Watts."

20. Through this lawsuit, Mr. Walls seeks accountability and compensation for the damage caused by Defendants' misconduct.

### Jurisdiction and Venue

21. This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the Constitution of the United States.

– 3 –

22. This Court has jurisdiction over federal claims pursuant to 28 U.S.C. § 1331 and state law claims pursuant to 28 U.S.C. § 1367. Venue is proper under 28 U.S.C. § 1391(b). Defendant City of Chicago is a municipal corporation located in this judicial district. Additionally, the events giving rise to the claims asserted herein occurred within this judicial district.

23. Mr. Walls is 42 years old.

24. At all times relevant to this complaint, Defendants former Chicago Police Sergeant Ronald Watts, Officer Gerome Summers Jr., and Officer Calvin Ridgell Jr. were police officers employed by the City of Chicago and acting within the scope of their employment and under the color of law. Collectively, these individual Defendants are referred to as Defendant Officers.

25. At all relevant times, Defendant Watts was a leader of the Second District Tactical Team that worked the Ida B. Wells housing complex.

26. Defendants Summers Jr. and Ridgell Jr. worked on Watts's tactical team.

27. At all relevant times, Defendant Philip J. Cline was the Superintendent of the Chicago Police Department.

28. Defendant City of Chicago is a municipal corporation under the laws of the State of Illinois. The City operates the Chicago Police Department ("CPD") and is responsible for the policies, practices, and customs of the City and the CPD.

### Factual Background

29. During the 2000s, the Ida B. Wells complex was actively patrolled by a tactical team of CPD officers, led by Defendant Watts.

30. Watts and his tactical team members were well known to the residents of Ida B. Wells and the surrounding area.

31. Watts and his tactical team members maintained a visible presence in the Ida B. Wells area. The Watts team had a reputation in the community for harassing, intimidating, and fabricating criminal charges against the area's residents and visitors.

32. The Watts team's pattern of harassment continued with Mr. Walls.

**Mr. Walls Is Framed on July 4, 2004**

33. On July 4, 2004, Mr. Walls was walking to a Fourth of July party when he encountered Defendant Watts and other police officers outside the 559 E. Browning building in the Ida B. Wells housing complex.

34. Mr. Walls did not have any drugs or illegal contraband in his possession.

35. Defendant Watts detained and searched Mr. Walls. After finding nothing, Defendant Watts asked if Mr. Walls had anything for him. Mr. Walls said no.

36. Defendant Watts then asked if Mr. Walls could get him some guns or money. Mr. Walls repeated that he had nothing for Defendant Watts.

37. Defendant Watts told Mr. Walls that he was going to jail.

38. Defendant Watts instructed other police officers to take Mr. Walls to the police station.

**Mr. Walls is Prosecuted, Convicted, and Sentenced for the 2004 Arrest**

39. The Defendant Officers prepared false and fabricated police reports related to this arrest.

40. On the basis of these false reports, Mr. Walls was prosecuted for a drug crime.

− 5 −

41.     Even though Mr. Walls was innocent of the charge, knowing that he risked a more severe penalty if he went to trial and lost, Mr. Walls accepted a plea deal.

42.     Mr. Walls was sentenced to three years in prison.

43.     Defendant Officers never disclosed to prosecutors that they had fabricated evidence and falsified police reports related to Mr. Walls's arrest.

44.     Defendant Officers never disclosed to the prosecutors any of their misconduct described herein. If the prosecutors had known that Defendant Officers fabricated evidence and committed the other misconduct described herein, they would not have pursued the prosecution of Mr. Walls.

**Defendant Watts and His Team Engaged in a Pattern of Misconduct for at Least a Decade, All Facilitated by the City's Code of Silence**

45.     It was no secret within the CPD that Watts and his crew engaged in the type of misconduct described herein.

46.     Government officials, including City of Chicago employees, knew about Watts's and his crew's alleged misconduct as early as 1999.

47.     Shortly thereafter, an FBI investigation of Watts and his crew was underway. The FBI investigation took place with the knowledge and occasional participation of the Chicago Police Department's Internal Affairs Division ("IAD").

48.     Because IAD was kept abreast of the FBI investigation, during the times complained of, City officials—including but not limited to the head of IAD and the CPD superintendents—were aware of credible allegations that Watts and his team were extorting and soliciting bribes from drug dealers.

49.     Watts used a drug dealer named "Big Shorty" to run drugs at the Ida B. Wells

complex. Big Shorty would sell the drugs, turning profits over to Watts in exchange for Watts's protection. Watts used drug dealers as phony informants to conduct illegal searches. Watts also offered to release arrestees if they provided him with weapons, drugs, or money.

50.    Targets of the FBI investigation extended beyond Watts to members of Watts's tactical team, including some of the Defendant Officers named herein.

51.    During the times complained of, the FBI investigation generated evidence showing that Watts engaged in systematic extortion, theft, the possession and distribution of drugs for money, planting drugs on subjects, and paying informants with drugs.

52.    Investigators also determined that Watts and his subordinates had engaged in these activities for years.

**Watts and Mohammed are Charged with Federal Crimes**

53.    In 2012, after at least a decade of engaging in criminal misconduct, Defendant Watts and former Chicago Police Officer Mohammed were caught red-handed, shaking down a person they thought was a drug courier but who was actually an agent for the FBI.

54.    The U.S. government subsequently charged Watts and Mohammed with federal crimes.

55.    Watts and Mohammed both pled guilty to federal criminal charges and were sentenced to terms of imprisonment. *See United States v. Watts,* No. 12- CR-87-1 (N.D. Ill.); *United States v. Mohammed*, No. 12-CR-87-2 (N.D. Ill.).

56.    In its sentencing memorandum in the criminal case against Watts, the government explained that "[f]or years□ the defendant [Watts] used his badge and his position as a sergeant with the Chicago Police Department to shield his own criminal activity from law enforcement

– 7 –

scrutiny." Watts's crimes included "stealing drug money and extorting protection payments" from the individuals he was sworn to protect and serve.

57.     The government revealed that, for years, Defendant Watts and former Chicago Police Officer Mohammed extorted tens of thousands of dollars in bribes from individuals at the Ida B. Wells public housing complex on numerous occasions as part of their duties with the CPD.

58.     During the sentencing hearing, the government urged Judge Sharon Johnson Coleman to "consider the other criminal conduct that the defendant [Watts] engaged in throughout the course of his career as a police officer," specifically noting that during the federal investigation, Watts "did other things such as putting a false case on the confidential source that was involved in our investigation. Watts had him arrested on drug charges. And the source . . . felt he had no chance of successfully fighting that case, so he pled guilty to a crime he didn't commit." The federal prosecutor wondered aloud "how many times [Watts] might have done something similar when the government was not involved."

59.     Following the federal indictments of Watts and Mohammed, City officials made efforts to downplay the magnitude of Watts's criminal enterprise.

60.     Notwithstanding the evidence investigators had amassed over the years pointing to a wide, decade-long criminal enterprise, CPD Superintendent Garry McCarthy publicly stated, "There is nobody involved other than the two officers who were arrested." As described in more detail below, McCarthy was wrong.

**The City's "Code of Silence"**

61.     While the federal government was investigating Watts and his crew, a "code of

– 8 –

silence" existed within the CPD.

62.     Under this code, police officers are expected to conceal each other's misconduct, in contravention of their sworn duties, and the penalties for breaking the code of silence within the CPD are severe.

63.     As one CPD officer has explained, "[The Chicago Police Academy told officers] over and over again we do not break the code of silence. Blue is Blue. You stick together. If something occurs on the street that you don't think is proper, you go with the flow. And after that situation, if you have an issue with that officer or what happened, you can confront them. If you don't feel comfortable working with them anymore, you can go to the watch commander and request a new partner. But you never break the code of silence."

64.     Pursuant to this "code of silence," each of the Defendant Officers concealed from Mr. Walls information that Watts and his crew members were in fact engaged in a wide-ranging pattern of misconduct. Had this information been disclosed to Mr. Walls he would have used it to impeach the officers' accounts, which would have changed the outcome of the criminal proceedings instituted against him.

65.     Also, consistent with this "code of silence," the few people who stood up to Watts and his crew and/or attempted to report his misconduct were either ignored or punished, while Watts and his crew continued to engage in misconduct with impunity.

**The Careers of CPD Officers Daniel Echeverria and Shannon Spalding are Nearly Ruined**

66.     In or around 2006, two Chicago police officers, Daniel Echeverria and Shannon Spalding, learned credible information from arrestees that Watts and his crew were engaged in illegal drug activity.

67. Officer Echeverria took the allegations seriously and reported them to a CPD supervisor. The supervisor made clear that he was not interested in hearing about the allegations, and he directed Echeverria not to document the allegations.

68. Echeverria and Spalding subsequently reported the allegations about Watts and his crew to the FBI. Soon thereafter, Echeverria and Spalding began cooperating with the FBI and actively assisting the FBI with its investigation of Watts and his crew.

69. When their cooperation became known to officers within their CPD chain of command, Spalding and Echeverria were labeled "rats" within the Department, their lives were threatened, and they endured all manner of professional retaliation by members of the CPD.

70. Spalding and Echeverria subsequently sued the City for the retaliation they suffered for blowing the whistle on Watts and his crew. On the eve of trial in that case, the City settled for $2 million.

**CPD Officer Michael Spaargaren's Life is Threatened**

71. Sometime in the mid-2000s, CPD Officer Michael Spaargaren was assigned to work with Watts in public housing.

72. Spaargaren observed that Watts did not inventory drugs and money that officers seized during arrests, and Spaargaren confronted Watts about the misconduct.

73. In response, Watts threatened to fabricate allegations of misconduct against Spaargaren and made veiled threats to kill him.

74. A CPD lieutenant in the chain of command—James Spratte—subsequently warned Spaargaren to keep his mouth shut or his life would be in danger.

75. Fearful for his life, Spaargaren opted to take a one-and-a-half-year leave of

− 10 −

absence from CPD rather than continue to work under Watts.

## Citizen Complaints Went Nowhere

76.     Defendant Watts, former Chicago Police Officer Mohammed, and other members of Watts's tactical team accumulated hundreds of citizen complaints concerning violations of citizens' civil rights over the years. These complaints began well before the misconduct Defendants committed against Mr. Walls. Despite the shocking number of citizen complaints directed against Watts and his team, the City did nothing to stop the misconduct.

77.     As for the complaints that the City bothered to investigate, the City often failed to seek out known witnesses and corroborating evidence and even ignored corroborating evidence—instead, the City would side with officers' boilerplate denials over complainants and their witnesses, no matter how many citizens came forward with the same type of complaint.

78.     The Illinois Appellate Court criticized the City for its utter failure to address the misconduct of Watts and his team.

79.     In multiple instances, the City actually assigned Watts to investigate complaints made against him or members of the team he supervised.

## The City Turns a Blind Eye to the Clear Pattern of Alleged Misconduct that Emerged from Watts and His Crew

80.     Despite all the evidence that was amassed over the years of a pattern and practice of criminal misconduct by Defendant Officers, the City never conducted its own investigation of the clear pattern that emerged.

81.     As City officials were aware, the purpose of the FBI investigation was to investigate and prosecute criminal activity, not to impose discipline and control of the CPD.

82.     Nothing about the FBI investigation relieved the City of its fundamental

responsibility to supervise, discipline, and control its officers.

83. Nevertheless, the City completely abdicated this responsibility, allowing the widespread misconduct to continue undeterred throughout the FBI's criminal investigation of Watts and his crew.

84. During the FBI investigation, which spanned at least eight years, City officials had reason to believe that Watts and his crew continued engaging in criminal activity on the streets—extorting drug dealers and framing citizens for crimes they did not commit—yet City officials took no steps to prevent these abuses from occurring.

85. Instead, City officials let officers on Watts's crew continue to pursue criminal charges against citizens like Mr. Walls and continue to fabricate false police reports and testify falsely against citizens like Mr. Walls.

86. City officials withheld information they had about the officers' pattern of transgressions—information that citizens like Mr. Walls could have used to impeach the corrupt officers and defend against the bogus criminal charges brought against them.

**Exonerations**

87. After the extensive scope of Defendant Watts and his crew's corruption came to light, on September 12, 2017, a group of similarly situated innocent victims filed a Consolidated Petition for Relief From Judgment and To Vacate Convictions Pursuant to 735 ILCS 5/2-1401 ("Consolidated Petition").

88. On November 16, 2017, upon the State's motion, Judge LeRoy K. Martin, Jr. vacated and *nolle prossed* all of the convictions related to the fifteen (15) Petitioners named in the Consolidated Petition.

89.     In commenting on the extraordinary decision to agree to vacate all the convictions tied to Watts and his team, the head of CCSAO's Conviction Integrity Unit, Mark Rotert, stated that, "In these cases, we concluded, unfortunately, that police were not being truthful and we couldn't have confidence in the integrity of their reports and their testimony."

90.     On September 24, 2018, eighteen (18) other similarly situated innocent victims were given a semblance of justice. Upon the State's motion, Judge LeRoy K. Martin, Jr. vacated 23 convictions, and the State *nolle prossed* all charges related to the convictions stemming from Watts and his team's wrongful arrests.

91.     Following this decision, Mr. Rotert explained that "these arrests were purely conjured . . . . [Watts and his team] were basically arresting people and framing them or were claiming they were involved in drug offenses that either didn't occur or didn't occur the way these police officers said."

92.     At a press conference where she stood side-by-side with many of the exonerated, Cook County State's Attorney-Elect Kimberly Foxx stated that "[t]he system owes an apology to the men who stand behind us."

93.     On November 2, 2018, seven (7) more victims had eight (8) additional convictions voluntarily dismissed by the CCSAO.

94.     In a press release, CCSA Foxx stated that the "pattern of misconduct" by Watts and his team caused her "to lose confidence in the initial arrests and the validity of these convictions."

95.     Referring to the exonerees as "victims," Ms. Foxx wished them "a path forward in healing and justice."

− 13 −

96.     The CCSAO has since voluntarily dismissed additional convictions.

97.     On February 24, 2020, after another mass dismissal and in reference to the Watts scandal, Ms. Foxx stated: "I think it's important that we acknowledge the harm that was caused when we talk about these cases. It's not just these men. It's the erosion of the trust in the justice system when we allow for those [men] to be wrongfully convicted based on the misdeeds of corrupt law enforcement."

98.     On December 15, 2020, after another mass dismissal and in reference to the Watts scandal, Ms. Foxx stated: "The seeds of distrust for our criminal justice system run deeply in communities most impacted by violence because of people in power like Sergeant Watts and his cronies who targeted and criminally preyed on these communities, leaving these neighborhoods feeling like their voice didn't matter." Regarding the exonerations, Ms. Foxx went on to state that it is "always the right time to do the right thing" and "never too late to deliver justice" to the Watts-related victims.

99.     On February 19, 2021, after yet another mass dismissal, Ms. Foxx stated: "Vacating the convictions of these nine people today who were targeted by former Police Sergeant Watts provides just a fraction of relief for those who spent time in prison, away from their families, as we will never be able to give them that time back."

100.    In a press release on November 4, 2021—when five (5) more convictions were dismissed—Ms. Foxx stated: "As prosecutors, we know that harm was caused …Today is a step towards righting the wrongs of the past and giving these individuals their names back."

101.    On February 1, 2022, during a hearing that resulted in twenty (20) more dismissals of Watts-related convictions, the Presiding Judge of the Cook County Criminal

– 14 –

Courts, Erica L. Reddick, called the Watts era "a blight on the criminal justice system."

102. The CCSAO will no longer call certain members of Watts's crew, including at least some of the Defendant Officers named herein, as witnesses in any pending or future matters due to concerns about their credibility and alleged involvement in misconduct.

103. In November 2017, former Superintendent of the Chicago Police Department Eddie T. Johnson placed multiple members of Watts's crew on desk duty.

104. Mr. Walls received a certificate of innocence stemming from his arrest and conviction certifying that Mr. Walls was, in fact, innocent of the crime of which he was convicted and for which he should never have been arrested in the first place.

### Mr. Walls's Damages

105. Because of the Defendants' acts and omissions, Mr. Walls was subjected to police harassment and unfair criminal proceedings.

106. The Defendant Officers' misconduct and false accusations subjected Mr. Walls to a felony conviction and wrongful punishment before he was exonerated.

107. The pain and suffering caused by being wrongfully convicted has been significant. During his time in prison, Mr. Walls was deprived of the everyday pleasures of basic human life, and his freedom was taken from him. Since then, Mr. Walls has had to live with a felony record he did not deserve.

108. As a result of the foregoing, Mr. Walls suffered damages proximately caused by Defendants' wrongdoing.

### Count I: 42 U.S.C. § 1983 – Due Process

109. Each paragraph of this Complaint is incorporated as if restated fully herein.

110. In the manner described more fully above, Defendant Officers, while acting as investigators, individually, jointly, and in conspiracy with each other, deprived Plaintiff of his constitutional right to due process and a fair trial.

111. In the manner described more fully above, Defendant Officers deliberately withheld exculpatory evidence from Plaintiff and from state prosecutors, among others, as well as knowingly fabricated false evidence, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

112. Likewise, in the manner described more fully above, Defendant Philip J. Cline and other as-yet-unidentified CPD supervisors (collectively, "Defendant Supervisory Officers") had knowledge of a pattern of misconduct by Watts and his team. These Defendant Supervisory Officers knew of a substantial risk that Watts and his team would violate the rights of Mr. Walls and other residents and visitors of the Ida B. Wells complex, and they deliberately chose a course of action that allowed those abuses to continue, thereby condoning those abuses.

113. The constitutional injuries complained of herein were proximately caused by the intentional misconduct of Defendant Supervisory Officers or were proximately caused when Defendant Supervisory Officers were deliberately or recklessly indifferent to their subordinates' misconduct, knowing that turning a blind eye to that misconduct would necessarily violate Plaintiff's constitutional rights.

114. In addition, Defendant Supervisory Officers themselves concealed exculpatory evidence from Mr. Walls, specifically information about Watts and his team's pattern of misconduct. In this way, Defendant Supervisory Officers violated Mr. Walls's due process right to a fair trial deliberately and with reckless disregard for Mr. Walls's rights.

− 16 −

115.    Defendants' misconduct directly resulted in the unjust criminal conviction of Plaintiff, denying him of his constitutional right to due process and a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Plaintiff could not and would not have been pursued.

116.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others, and in total disregard of the truth and of Mr. Walls's clear innocence.

117.    Defendants' actions were taken under color of law and within the scope of their employment.

118.    The City of Chicago is also directly liable for the injuries described in this Count because the City and CPD maintained official policies and customs that were the moving force behind the violation of Plaintiff's rights, and also because the actions of the final policymaking officials for Defendant City of Chicago and CPD were the moving force behind the violation of Plaintiff's rights.

119.    At all times relevant to the events described in this Complaint and for a period of time prior thereto, Defendant City of Chicago maintained a system that violated the due process rights of criminal defendants like Mr. Walls by concealing exculpatory evidence of Chicago police officers' patterns of misconduct.

120.    In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, Defendant City of Chicago had notice of a widespread practice by its officers and agents under which criminal suspects, such as Mr. Walls, were routinely deprived of exculpatory evidence, were subjected to criminal proceedings based on false evidence, and

− 17 −

were deprived of liberty without probable cause, such that individuals were routinely implicated in crimes to which they had no connection and for which there was scant evidence to suggest that they were involved.

121. As a matter of both policy and practice, Defendant City directly encourages, and is thereby the moving force behind, the very type of misconduct at issue here by failing to adequately train, supervise, control, and discipline its police officers, such that its failure to do so manifests deliberate indifference. Defendant City's practices lead police officers in the City of Chicago to believe that their actions will never be scrutinized and, in that way, directly encourage further abuses such as those that Mr. Walls endured.

122. The above-described widespread practices, which were so well settled as to constitute the de facto policy of the City of Chicago, were allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it. These widespread practices were allowed to flourish because Defendant City and the CPD declined to implement sufficient policies or training, even though the need for such policies and training was obvious. Defendant City and the CPD also declined to implement any legitimate mechanism for oversight or punishment of officers, thereby leading officers to believe that they could violate citizens' constitutional rights with impunity.

123. Furthermore, the misconduct described in this Complaint was undertaken pursuant to the policy and practices of Defendant City in that the constitutional violations committed against Plaintiff were committed with the knowledge or approval of persons with final policymaking authority for the City of Chicago and the CPD, or were actually committed by persons with such final policymaking authority.

124. Indeed, municipal policymakers have long been aware of Defendant City's policy and practice of failing to properly train, monitor, investigate, and discipline misconduct by its police officers, but have failed to take action to remedy the problem.

125. For example, at a City Council hearing on September 28, 1999, in response to two high-profile unjustified police shootings, then-Superintendent Terry Hillard noted the need for better in-service training on the use of force, early detection of potential problem officers, and officer accountability for the use of force.

126. In June 2000, the Chairman of the Committee on Police and Fire of the Chicago City Council submitted an official resolution recognizing that "[Chicago] police officers who do not carry out their responsibilities in a professional manner have ample reason to believe that they will not be held accountable, even in instances of egregious misconduct."

127. In 2001, the Justice Coalition of Greater Chicago ("JCGC"), a coalition of more than a hundred community groups, confirmed the findings of that resolution, concluding that the CPD lacked many of the basic tools necessary to identify, monitor, punish, and prevent police misconduct. The JCGC findings were presented to Mayor Richard Daley, Superintendent Hillard, and the Chicago Police Board.

128. Despite municipal policymakers' knowledge of the City's failed policies and practices to adequately train, supervise, investigate, discipline, and control its police officers, nothing was done to remedy these problems.

129. As a result, the CPD has continued to respond to complaints of police misconduct inadequately and with undue delay and has continued to recommend discipline in a disproportionately small number of cases.

130.    Indeed, by its own admissions, more than 99% of the time when a citizen complains that his or her civil rights were violated by police officers, the City sides with the police officer and concludes that no violation occurred.

131.    Before she was elected Mayor of the City of Chicago, then-Police Board Chair Lori Lightfoot made clear that "[a]ny of those officers [on Watts team] who remain on the job must be quickly brought to justice through criminal prosecution and/or disciplinary action."

132.    Yet, as of the filing of this complaint, the Lightfoot administration has not taken the type of action that Ms. Lightfoot demanded before she became mayor.

133.    Notably, Defendant Watts and his crew are not the first Chicago police officers who were allowed to abuse citizens with impunity over a period of years while the City turned a blind eye.

134.    For instance, in 2001, Chicago Police Officer Joseph Miedzianowski was convicted on federal crime charges, including racketeering and drug conspiracy. The jury found that Miedzianowski engaged in corruption for much of his 22-year police career, using street informants to shake down drug dealers and sell drugs.

135.    Miedzianowski, like Defendant Officers in this case, had accumulated scores of complaints over the years. As the Appellate Court has stated, the Defendant City "did nothing to slow down the criminals. Instead, it informed the corrupt officers about the complaint and named the source." The Defendant City deemed such complaints unfounded or not sustained.

136.    Likewise, in 2011, Chicago police officer Jerome Finnigan was convicted and sentenced on federal criminal charges, including a charge of attempting to hire someone to kill a police officer who Finnigan believed would be a witness against him on his own corruption

– 20 –

charges in state court.

137. Finnigan was part of a group of officers in Defendant City's Special Operations Section that carried out robberies, home invasions, unlawful searches and seizures, and other crimes.

138. Finnigan and his crew engaged in their misconduct at about the same time that Mr. Walls was targeted by Defendant Watts and his crew.

139. Finnigan, like Defendant Officers in this case, had accumulated scores of citizen complaints over the years, which Defendant City routinely deemed unfounded or not sustained.

140. At his sentencing hearing in 2011, Finnigan stated, "You know, my bosses knew what I was doing out there, and it went on and on. And this wasn't the exception to the rule. This was the rule."

141. In the case of *Klipfel v. Bentsen*, No. 94-cv-6415 (N.D. Ill), a federal jury found that, as of 1994, the CPD maintained a code of silence that facilitated misconduct committed by Miedzianowski.

142. Likewise, in the case of *Obrycka v. City of Chicago et al.*, No. 07-cv-2372 (N.D. Ill.), a jury found that, as of February 2007, "the City [of Chicago] had a widespread custom and/or practice of failing to investigate and/or discipline its officers and/or code of silence."

143. The same code of silence in place at the CPD during the time periods at issue in the *Klipfel* case and the *Obrycka* case was also in place during the times complained of herein.

144. Indeed, the problems found to exist by the jury in *Klipfel* and *Obrycka* continue to this day. In December 2015, then-Mayor Rahm Emanuel acknowledged that a "code of silence" exists within the CPD that encourages cover-ups of police misconduct, and that the City's

attempts to deal with police abuse and corruption have never been adequate.

145. Even more recently, in January 2020, the CPD's then-interim head Charlie Beck also acknowledged the code of silence.

146. The policies, practices, and customs set forth above were the moving force behind the constitutional violations in this case and directly and proximately caused Plaintiff to suffer the grievous injuries and damages set forth above.

147. Defendant City's investigation of complaints is characterized by unreasonably long delays, despite the relatively straightforward nature of many misconduct claims.

148. Although Defendant City has long been aware that its supervision, training, and discipline of police officers is entirely inadequate, Defendant City has not enacted any substantive measures to address that deficiency.

149. Instead, Defendant City continues to inadequately investigate citizen complaints and fails to take action against officers when necessary. It has also failed to modify its officer training programs to reduce misconduct against Chicago residents or to implement a system to identify and track repeat offenders, districts, or units.

150. Plaintiff's injuries were caused by CPD officers, agents, and employees of Defendant City of Chicago, including, but not limited to, the individually named Defendants, who acted pursuant to the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

**Count II: 42 U.S.C. § 1983 – Malicious Prosecution and
Unlawful Pretrial Detention – Fourth and Fourteenth Amendment**

151. Each paragraph of this Complaint is incorporated as if restated fully herein.

152. In the manner described more fully above, Defendants, while acting as

investigators, individually, jointly, and in conspiracy with each other, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent.

153. In doing so, Defendants caused Plaintiff to be unreasonably seized without probable cause and deprived of his liberty, in violation of Plaintiff's rights secured by the Fourth and Fourteenth Amendments.

154. The false judicial proceedings against Plaintiff were instituted and continued maliciously, resulting in injury.

155. Defendants deprived Plaintiff of fair state criminal proceedings, including the chance to defend himself during those proceedings, resulting in a deprivation of his liberty.

156. In addition, Defendants subjected Plaintiff to arbitrary governmental action that shocks the conscience in that Plaintiff was deliberately and intentionally framed for a crime of which he was totally innocent. This was accomplished through Defendants' fabrication and suppression of evidence.

157. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others, and with total disregard of the truth and of Plaintiff's clear innocence.

158. The Defendants' actions were taken under color of law and within the scope of their employment.

159. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and

other grievous and continuing injuries and damages as set forth above.

160.    Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendant City of Chicago, and by Defendants who were final policymakers for Defendant City of Chicago, in the manner described more fully above.

### Count III: 42 U.S.C. § 1983 – Failure to Intervene

161.    Each paragraph of this Complaint is incorporated as if restated fully herein.

162.    In the manner described more fully above, during the constitutional violations described herein, Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

163.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others, and with total disregard of the truth and of Plaintiff's innocence.

164.    The Defendants' actions were taken under color of law and within the scope of their employment.

165.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

166.    Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendant City of Chicago and by Defendants, who were final policymakers for Defendant City of Chicago, in the manner described more fully above.

### Count IV: 42 U.S.C. § 1983
### Conspiracy to Deprive Constitutional Rights

167.    Each paragraph of this Complaint is incorporated as if restated fully herein.

168. Prior to Plaintiff's conviction, all of the Defendant Officers, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and thereby to deprive him of his constitutional rights, all as described above.

169. In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability by depriving Plaintiff of his rights.

170. In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

171. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others, and with total disregard of the truth and of Plaintiff's innocence.

172. The Defendants' actions were taken under color of law and within the scope of their employment.

173. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

174. Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendant City of Chicago and by Defendants who were final policymakers for Defendant City of Chicago, in the manner described more fully above.

### Count V: Illinois Law – Malicious Prosecution

175. Each paragraph of this Complaint is incorporated as if restated fully herein.

– 25 –

176. In the manner described more fully above, Defendants accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so.

177. In so doing, these Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

178. The Defendants' actions were taken under color of law and within the scope of their employment.

179. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

### Count VI: Illinois Law – Intentional Infliction of Emotional Distress

180. Each paragraph of this Complaint is incorporated as if restated fully herein.

181. The actions, omissions, and conduct of Defendant Officers, as set forth above, were extreme and outrageous. These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

182. The Defendants' actions were taken under color of law and within the scope of their employment.

183. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## Count VII: Illinois Law – Civil Conspiracy

184. Each paragraph of this Complaint is incorporated as if restated fully herein.

185. As described more fully in the preceding paragraphs, Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of his rights.

186. In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

187. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others, and with total disregard of the truth and of Plaintiff's innocence.

188. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## Count VIII: Illinois Law – Respondeat Superior

189. Each paragraph of this Complaint is incorporated as if restated fully herein.

190. While committing the acts alleged in the preceding paragraphs, Defendant Officers were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment.

191. Defendant City of Chicago is liable as principal for all torts committed by their agents.

### Count IX: Illinois Law – Indemnification

192. Each paragraph of this Complaint is incorporated as if restated fully herein.

193. Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment.

194. Defendant Officers were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

WHEREFORE, Plaintiff Dorian Walls respectfully requests that this Court enter a judgment in his favor and against the City of Chicago, former Chicago Police Sergeant Ronald Watts, Officer Gerome Summers Jr., Officer Calvin Ridgell Jr., Philip J. Cline, and other as-yet-unidentified officers of the Chicago Police Department.

### JURY DEMAND

Plaintiff, Dorian Walls, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

/s/ Scott Rauscher
*One of Plaintiff's Attorneys*

Jon Loevy
Arthur Loevy
Scott Rauscher
Joshua Tepfer
Theresa Kleinhaus
Sean Starr
LOEVY & LOEVY
311 North Aberdeen Street, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
scott@loevy.com